## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **MICHAEL A. RIVERA,** | : | |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | **CIVIL ACTION NO. 25-CV-0333** |
| | : | |
| **HOWARD HOLLAND, _et al._,** | : | |
| **Defendants.** | : | |

## MEMORANDUM

**SCHMEHL, J.**                                              **APRIL     , 2025**

Michael A. Rivera, a prisoner housed at Chester County Prison ("CCP"), filed this civil rights action naming numerous medical and correctional officials in his original Complaint (ECF No. 2). Thereafter, he filed a Supplemental Complaint (ECF No. 6) and a Motion for Preliminary Injunction (ECF No. 7.) Rivera's claims against medical officials concern his treatment upon being transferred to CCP from the Howard R. Young Correctional Facility in Delaware and thereafter. Other claims against correctional officials concern his receipt of mail, lack of bedding, legal access, sexual harassment, lack of exercise, retaliation, sleep deprivation, failure to protect, excessive force, disciplinary infractions, lack of cleaning supplies, lack of prison employment, seizure of funds, and commissary price gouging at CCP. Rivera has named each Defendant in their official and individual capacities. He also seeks leave to proceed _in forma pauperis_. For the following reasons, the Court will grant Rivera leave to proceed _in forma pauperis_, sever non-medical claims against correctional officials under the misjoinder rule, Federal Rule of Civil Procedure 21, and screen his medical claims.[1] On statutory screening

---

[1] The Defendants named in the original Complaint that were involved in Rivera's medical claims are PrimeCare Medical, Inc. ("PrimeCare"), Dr. Mathew Kavalack, PrimeCare Medical Administrator Karen Murphy, PA Brianna Culp, PA Patty, PA Isabella, PA Gabriella Checchi,

pursuant to 28 U.S.C. § 1915(e)(2)(B), the Court determines that some medical claims are plausible and can be served, but other claims must be dismissed. Rivera will be granted the option of proceeding only the claims that are pled plausibly, or file an amended complaint to attempt to cure the defects in the other medical claims.

## I.    FACTUAL ALLEGATIONS[2]

Rivera arrived at CCP on October 30, 2024 on an interstate detainer.[3] (Compl. ¶ 1.) At a medical intake the same day he informed non-defendant Nurse Chanell of his existing back and shoulder injuries, eczema, and the medications he was prescribed for these conditions. (*Id.* at ¶ 3.) He also informed her of "memos" from his prior institution indicating he was to be handcuffed in front and given a bottom bunk, and gave her a supply of his medications he was prescribed for three years while in custody in Delaware. (*Id.* 3-4.) He had received MRI, x-ray, and nerve studies while housed there. (*Id.* at ¶ 4.) The next day, he saw PA Patty and gave her

---

and Medical Director Jennifer. Certain allegations in the original Complaint against non-medical provider Defendants C/O A. Presswood, C/O N. Hirsh and C/O Odukale will also be deemed to be part of the medical-based claims. In the Supplemental Complaint, Rivera added medical-based claims against Defendants PA Jaclyn Casey, Dr. Eastdat, Dr. Olinsky, Dr. Morrison, Dr. Cirrone, Dr. Morrison, and MAT Counselor Stephanie Conally.

[2] Rivera's 59-page Complaint consists of the form available to unrepresented litigants to file civil rights claims with additional handwritten pages. (ECF No. 2.) The Court considers the entire submission to constitute the Complaint, to which the Court adopts the sequential pagination assigned by the CM/ECF docketing system. The factual allegations set forth in this Memorandum are taken from Complaint and the Supplemental Complaint (ECF No. 6). The Court may also consider matters of public record when conducting a screening under § 1915. *Buck v. Hampton Twp. Sch. Dist.*, 452 F.3d 256, 260 (3d Cir. 2006). Quotations may be cleaned up for spelling, capitalization and grammar. Because the Court will direct the non-medical claims be severed from this case into a new civil action, the factual discussion covers only Rivera's medical claims.

[3] Public records indicate that Rivera is awaiting trial on drug possession charges that were filed in 2018. *Commonwealth v. Rivera*, CP-15-CR-0003890-2018 (C.P. Chester).

the same information about his issues, pain, and skin irritation; with regard to his medication she stated "they [meaning CCP's medical unit] did not prescribe Neurontin" and that she would order a "taper" when he asked if he would be given a replacement pain treatment.[4]  (*Id.* at ¶ 5.) Rivera was seen by Dr. Mathew Kavalack on November 2, 2024.  (*Id.* at ¶ 6.)  When he explained his medical conditions, Kavalack responded "let's see if you're here in a month."  (*Id.*) Both Kavalack and Patty said they had not reviewed his medical records and "did not give [him] anything in regard to medical treatment or any memo status to accommodate or treat [him]." (*Id.*)  He was given no reason why his prior medication was discontinued nor a reason he was not prescribed another medication, even though "there is a Neurontin section on the med cert and there is also other medication available but I was told to wait a month."  (*Id.* at 7.)

Rivera asserts that he put in three sick calls and was seen on November 24, 2024, by a non-defendant Nurse named Jessica/Elise, who he asked about his prescription for Mobic that he was given in Delaware.[5]  (*Id.* at ¶ 9.)  Jessica/Elise asked if he was getting his Mobic at CCP and he responded "yes I'm receiving that but nothing is addressing my nerve damage and pain in place of discontinuing my Neurontin."  (*Id.*)  He was seen again by PA Patty on November 26, 2024, again complained about pain, "nerve jolts," and lack of sleep from being in pain.  (*Id.* ¶ 10.)  Even though he was housed in a single cell, he still wanted the "bunk and cuff memos in case [he] was moved somewhere" when he began an opioid use disorder program.  (*Id.*)  He

---

[4] Neurontin is an anticonvulsive drug used in adults to treat nerve pain.  *See* https://www.drugs.com/neurontin.html (last viewed March 19, 2025).  The meaning of "taper" is unclear but may refer to Rivera then undergoing detox from opiates.

[5] Mobic is a brand name for meloxicam, a nonsteroidal anti-inflammatory drug (NSAID) used to relieve pain, tenderness, swelling, and stiffness caused by osteoarthritis.  *See* https://www.drugs.com/mobic.html (last viewed March 19, 2025.)

received skin and hair medication, but nothing additional for his pain and was not provided the "memos" he sought. (*Id.*)

Rivera received electrolytes and "comfort meds" and had his weight and blood pressure were checked twice daily for the first two weeks he was housed at CCP because he had opiates in his system and was in detox. (*Id.* ¶ 11.) In the detox program he learned that other inmates received pain and mental health medication, but he was given nothing. (*Id.*) He put in another sick call slip on December 3 "after seeing PA Patty [on November 26] due to her not treating [his] neck and back injuries," asserting that she recorded in his chart that his "concerns were addressed" even though Rivera claims they were not. (*Id.* ¶ 12.) He put in additional slips but heard nothing back. (*Id.*) He asserts a denial of care claim against PrimeCare, PA Patty and Dr. Kavalack for failing to provide him with Neurontin or physical therapy. (*Id.* ¶¶ 13-15.)

Separately, Rivera claims that Karen Murphy, PrimeCare administrator, allegedly allows corrections officials to interfere with inmate care when inmates are involved in physical altercations and have injuries or are suicidal, but does not allege that he was himself injured by this conduct. (*Id.* ¶ 18.) Rather than get treatment, he asserts that these individuals are sent to segregated housing and that the PA's do not see inmates in segregation. (*Id.* ¶ 19.) Non-defendant Dr. Glasgo allegedly told Rivera that "medical also is in non-compliance" with a Pennsylvania regulation concerning sanitizing mattresses, which Murphy has "acknowledged and accepted." (*Id.* ¶ 20.) Murphy also allegedly "fails to adhere" to regulations on prisoner grievances. (*Id.* ¶ 21.)

Rivera next claims that, following an attack by another inmate, he "was treated, then asked the question was I homicidal/suicidal," which he denied and was then sent to segregation. (*Id.*) That night, when non-Defendant Nurse Kelsey came to dispense medication, he asked her

for a bandage because one he received earlier fell off, but she did not bring him one. (*Id.* ¶ 22.) CO Presswood allegedly did not permit her to give him his medication. (*Id.*) At the end of his shift on December 17, 2024, C/O Hirsh confiscated digestive medication that Rivera had been dispensed earlier that day when Hirsh was present. (*Id.* ¶ 25.) He claims that these two incidents, along with other times that his "verbal" sick call requests were ignored, and an incident when Defendant Correctional Officer Odukele interrupted his discussion with a medical official and would not give him privacy while he was giving a urine sample, show a "custom of corrections [officers] interfering with inmates' medical needs which holds the County and PrimeCare Medical liable." (*Id.* ¶ ¶ 25-31.) The conversation Odukele allegedly interrupted was with Defendant PA Breanna Culp, during which Rivera believed that he would be discussing his dosage and also asked if he could be addressed regarding his back pain, but Culp replied "I'm only going to handle your legs" and said she would order compression socks. (*Id.* ¶ 29.) It was when Rivera explained that he had put in repeated sick calls that Odukele "said we had to go." (*Id.*)

Rivera's Supplemental Complaint is written as a near daily log of his medical care and events related to the non-medical claims from January 2, 2025 to when he submitted the pleading on February 25, 2025. He asserts on January 2, 2025, non-defendant Nurse Keisha Bates came to give him medication but forgot his cream and shampoo for his eczema. He put in a sick call with non-defendant Nurse Vicky, who took his vitals through the door flap of the cell and said she would schedule him for his back and neck complaint and give him ibuprofen. (Suppl. Compl. ¶ 104-105.) The next day, Rivera told non-defendant "Mental Health Kayla" that he was frustrated by not being treated medically and was being harassed by corrections. Non-defendant "Meds Nurse Tiera" told him that his suboxone and mobic "ran out" and "acted like she didn't

want to give me my eczema meds." (*Id.* ¶ 105.)  Later that day, non-defendant "PM Nurse Dice" gave him "no meds at all, said I was off meds." (*Id.*)  He receive one ibuprofen pill from Nurse Kim on January 6, and in that evening told the sick call service nurse he had pain and his meds were cut off. (*Id.* ¶ 106.)  On January 7, Rivera told "Mental Health Bri that he wasn't being treated at all" and she told him to put in a sick call in. (*Id.*)  He also told Nurse Dice about his neck and back pain that day and on January 9, and told "Kala" the next day. (*Id.* at ¶¶ 106-107.)

On January 10, Rivera had a MAT (Medical Assisted Treatment) appointment with Defendant PA Jaclyn Casey during which she addressed his MAT medication dosage.[6]  When he asked her to help with his neck and back pain, "she gave nothing." (*Id.* ¶ 107.)  Following an incident with two correctional officers on January 11 during which he injured a finger and his wrist, Nurse Leah looked at the wrist on the morning of January 13 and told Rivera she would arrange an appointment for him to see a PA. (*Id.* ¶ 108.)  PA Patty looked at his wrist and observed bruising and swelling and said he would be scheduled for x-ray that was taken on January 17. (*Id.* at 109.)  On January 18, non-defendant Nurse Keisha Bates failed to bring his cream and shampoo medicine, telling Rivera there was none. (*Id.*)  On January 19, non-defendant Nurse Kelsey brought him the lotion and shampoo medication that Bates said they didn't have the day earlier. (*Id.*)

During the January 15 appointment with PA Patty she prescribed 1000 mg of Tylenol two times a day. (*Id.* ¶ 110.)  Rivera had a follow up appointment with her on January 21 for the x-rays where she said the wrist look fine and Rivera responded "it's not broken but it's not fine what about a MRI?" (*Id.*)  She responded to Rivera that they are expensive and he could get one

---

[6] Rivera's references to MAT appears to be a course of treatment for opioid use disorder ("OID").

when he gets out.  (*Id.*)  When Rivera told her "I had "3 ½ years left," she said that she would

schedule him to come back in three weeks and "we'll see then."  (*Id.*)  PA Patty also told him

that his shoulder x-ray showed some differences due to age or degeneration, but Rivera told her

it started "aching again after C/O Guldan yanked it" and asked if he could get a shoulder MRI.

(*Id.* ¶ 111.)  Rather than answer, PA Patty "spun/moved the conversation to the topic of 'she's

giving me medication,'" to which Rivera responded that "she should have been giving me

something for preexisting.  I came with medication from Delaware for my neck and back

injuries."  (*Id.*)  PA Patty responded that Rivera was being given mobic, but he protested that he

still had not received Neurontin and was provided with no replacement.  (*Id.* ¶ 112.)  She then

said that she would give him a choice of two medications including Cymbalta 30mg, which

"help[s] diabetics suffering from neuropathy."  (*Id.* ¶¶ 112-113.)  Rivera agreed to the

prescription and PA Patty told him they would discuss the need for an MRI in three weeks.  (*Id.*

¶ 113.)  However, PA Patty failed to provide a "bunk memo or the cuff front memo or the MRI

for [his] shoulder injury" and Rivera claims that it took three months from when he was

transferred to CCP to get a substitute for his Neurontin.  (*Id.* ¶ 114.)

     Rivera also includes allegations about mental health treatment, asserting he was seen

regularly between December 5, 2024 and December 26, 2024, but after he complained to a

deputy warden and major he "did [not] get to the mental health till 1-23-25."  (*Id.* ¶ 117.)  He

states that on January 3, 2025, mental health doctors came to the RHU quad to speak to a few

inmates and explained to him "that they couldn't find escorts."  (*Id.* ¶ 118.)  Rivera claims he has

been diagnosed with PTSD, bipolar disorder, depression, and schizophrenia, and received

treatment during his prior incarceration, but asserts that Chester County "does not offer anything

more in regards to treatment."  (*Id.* ¶ 124.)  He claims that inmates do not "get any

programming" unless classified as "minimum" but he has failed to gain that classification because he was involved in a fight and that prison officials "have ignored [his] mental health history and the fact that [he is] currently enrolled in treatment regularly seeing the mental health doctors and two MAT counselors doing the best that I can do in my circumstances" while being housed in the RHU for 47 days. (*Id.* ¶¶ 126-127.)

On February 5, 2025, non-defendant Captain Griswald came to the RHU and Rivera told him *inter alia* about how he was not receiving mental health services because of his security classification. (*Id.* ¶ 172.) On February 7, Rivera was taken to see Defendant Dr. Orlinsky, a mental health provider, whom he asked about not receiving treatment for schizophrenia and bipolar disorder. (*Id.*) Orlinsky told him that Defendant Dr. Morrison was to follow up and that he would be scheduling for a follow up appointment, but that did not happen. (*Id.* ¶ 173.) Rivera claims that he has not received the Neurontin prescribed in Delaware and has "not been treated as a mental health patient with my diagnosis is supposed to in RHU." (*Id.* ¶ 183.)

Based on these allegations in the Supplemental Complaint, Rivera asserts deliberate indifference claims against the "PAs employed by PrimeCare Medical, Inc. [for] denying me treatment for my preexisting conditions"; Dr. Eastdat, Dr. Olinsky, Dr. Morrison, Dr. Cirrone, PA Jaclyn Casey, and PA Patty for deliberate indifference to his preexisting conditions and not prescribing treatment; Medical Director Jenn and Administrator Karen Murphy as policy makers for PrimeCare based on a failure to train and for allowing unconstitutional customs; PA Culp for denial of treatment for preexisting conditions and his opiate use disorder; MAT counselor Stephanie Conelly for allowing corrections officials to interfere with providing MAT services; the IDT members not ensuring proper mental health treatment while he was housed on the RHU; and PrimeCare for not providing physical therapy and not prescribing Neurontin, having a

custom of not properly screening or documenting inmates with injuries caused by corrections staff, allowing corrections staff to harass inmates in the MAT program who are suffering from opiate use disorder, for the customs implemented by its employees, and for "allowing corrections staff to over escort and exaggerate security measures [that] violates the ADA" for treatment of opiate use disorder. (Claims 1-18, 155-157.) He also asserts that Warden Holland, in his role as a supervisor, "enforces corrections to interfere with medical treatment." (Claim 146.)

As relief for his medical claims, Rivera seeks a preliminary injunction that he be provided with medical care, as well as money damages. (Compl ¶ 100; pg. 34.) Along with his Supplemental Complaint, Rivera filed a motion for a preliminary injunction that the Defendants be ordered to provide him his prescribed treatment for his neck and back pain, an MRI on his writs, shoulders, right ankle and "nose bone" because he has only received x-rays that show breaks but "not actual damage done by Defendants," treat his mental health issues, and other relief not associated with the medical claims continuing in this action. (ECF No. 7 at 1.)

## II.    STANDARD OF REVIEW

The Court grants Rivera leave to proceed *in forma pauperis*.[7] Accordingly, 28 U.S.C. § 1915(e)(2)(B)(ii) requires the Court to dismiss the Complaint if it fails to state a claim. Whether a complaint fails to state a claim under § 1915(e)(2)(B)(ii) is governed by the same standard applicable to motions to dismiss under Federal Rule of Civil Procedure 12(b)(6), *see Tourscher v. McCullough*, 184 F.3d 236, 240 (3d Cir. 1999), which requires the Court to determine whether the complaint contains "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quotations omitted); *Talley v.*

---

[7] Because Rivera is a prisoner, he must still pay the $350 filing fee for this case in installments as required by the Prison Litigation Reform Act.

*Wetzel*, 15 F.4th 275, 286 n.7 (3d Cir. 2021). At this early stage of the litigation, the Court will accept the facts alleged in the *pro se* complaint as true, draw all reasonable inferences in the plaintiff's favor, and ask only whether that complaint, liberally construed, contains facts sufficient to state a plausible claim. *Shorter v. United States*, 12 F.4th 366, 374 (3d Cir. 2021), *abrogation on other grounds recognized by Fisher v. Hollingsworth*, 115 F.4th 197 (3d Cir. 2024). Conclusory allegations do not suffice. *Iqbal*, 556 U.S. at 678.

The Court construes the allegations of a *pro se* litigant liberally. *Vogt v. Wetzel*, 8 F.4th 182, 185 (3d Cir. 2021) (citing *Mala v. Crown Bay Marina, Inc.*, 704 F.3d 239, 244-45 (3d Cir. 2013)). This requires the Court to remain flexible, especially considering a litigant's *pro se* status. *Id.* The Court will "apply the relevant legal principle even when the complaint has failed to name it." *Id.* However, "*pro se* litigants still must allege sufficient facts in their complaints to support a claim." *Id.* An unrepresented litigant also "cannot flout procedural rules - they must abide by the same rules that apply to all other litigants." *Id.; see also Doe v. Allegheny Cnty. Hous. Auth.*, No. 23-1105, 2024 WL 379959, at *3 (3d Cir. Feb. 1, 2024) ("While a court must liberally construe the allegations and 'apply the applicable law, irrespective of whether the pro se litigant mentioned it be name,' *Higgins v. Beyer*, 293 F.3d 683, 688 (3d Cir. 2002), this does not require the court to act as an advocate to identify any possible claim that the facts alleged could potentially support.").

## III.    DISCUSSION

### A.    Misjoinder of Claims

Rivera has asserted claims against medical providers concerning his treatment while at CCP, but also alleges numerous unrelated non-medical claims against a different group of Defendants. The Court will sever the claims based on deliberate indifference to medical needs

from the claims based on Rivera's conditions of confinement at CCP, asserted against non-medical provider defendants, so that they may proceed in separate lawsuits.

Federal Rule of Civil Procedure 18(a) states that "[a] party asserting a claim, . . . may join, as independent or alternative claims, as many claims as it has against an opposing party." Federal Rule of Civil Procedure 20 allows a plaintiff to join multiple defendants in one action if: (a) "any right to relief is asserted against them jointly, severally, or in the alternative with respect to or arising out of the same transaction, occurrence, or series of transactions or occurrences"; and (b) "any question of law or fact common to all defendants will arise in the action." "For courts applying Rule 20 and related rules, 'the impulse is toward entertaining the broadest possible scope of action consistent with fairness to the parties; joinder of claims, parties and remedies is strongly encouraged.'" *Hagan v. Rogers*, 570 F.3d 146, 153 (3d Cir. 2009) (quoting *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 724 (1966)).

"But this application, however liberal, is not a license to join unrelated claims and defendants in one lawsuit." *Pew v. Little*, No. 22-1488, 2024 WL 967823, at *2 (E.D. Pa. Mar. 6, 2024 (citing *McKinney v. Prosecutor's Office*, No. 13-2553, 2014 WL 2574414, at *14 (D.N.J. June 4, 2014) (internal quotations omitted)). "Thus multiple claims against a single party are fine, but Claim A against Defendant 1 should not be joined with unrelated Claim B against Defendant 2." *Gorrio v. Terra*, No. 23-4366, 2023 WL 8373167, at *6 (E.D. Pa. Dec. 4, 2023) (quoting *George v. Smith*, 507 F.3d 605, 607 (7th Cir. 2007)). Indeed, "[t]he courts[] . . . have frowned on prisoners' attempts to lump together their multifarious grievances about life in a single prison, let alone multiple prisons." *McKinney*, 2014 WL 2574414, at *15. To remedy a misjoinder, a Court may add or drop a party or sever any claims. Fed. R. Civ. P. 21. Rule 21

"give[s] district courts broad discretion in deciding whether to sever a case by way of severing parties or claims." *Graudins v. Retro Fitness, LLC*, 921 F. Supp. 2d 456, 467 (E.D. Pa. 2013).

Rivera's factual allegations can be broken down into essentially two distinct groups of claims. The medical claims are misjoined because they are entirely unrelated to Rivera's claims in his original Complaint against correctional officials concerning his receipt of mail, lack of bedding, legal access, sexual harassment, lack of exercise, retaliation, sleep deprivation, failure to protect, excessive force, disciplinary infractions, lack of cleaning supplies, lack of prison employment, seizure of funds, and commissary price gouging at CCP, as well as non-medical claims in his Supplemental Complaint concerning condition in the Restricted Housing Unit, retaliation, and wearing Muslim headwear. (ECF No. 6 at ¶¶ 128-172). *See Thompson v. Ferguson*, 849 F. App'x 33, 36 (3d Cir. 2021) (*per curiam*) ("Misjoinder of claims occurs when, among other things, the events that give rise to the plaintiff's claims do not stem from the same transaction."); *see also Roudabush v. United States*, No. 11-980, 2011 WL 13225005, at *6 (D.N.J. July 14, 2011) ("Here, the claims arising out of the state court trial appear to be completely unrelated, factually and legally, from the claims arising out of conditions at the jail."); *Saulberry v. Atl. Cnty. Jail*, No. 10-1004, 2010 WL 3825701, at *6 (D.N.J. Sept. 24, 2010) (severing claims where "the claims arising out of the arrests are completely unrelated, factually and legally, from the claims arising out of conditions at the jail").

Accordingly, the Order entered in this case will sever the non-medical claims into a separate civil action. Should Rivera determine to proceed on the non-medical claims, he will be required to pay a separate filing fee to pursue those claims.

**B.    Official Capacity Claims**

Rivera has named each Defendant in both his or her official as well as individual capacities. Official capacity claims against employees of a company that provides medical services like PrimeCare are not cognizable because PrimeCare is a private entity. *See Kreis v. Northampton Cnty. Prison*, No. 21-2360, 2022 WL 4236692, at *8 (E.D. Pa. Sept. 14, 2022) (stating that official capacity claims are "inapplicable to suits against private parties where the entity is also susceptible to suit") citing *Owens v. Connections Cmty. Support Programs, Inc.,* 840 F.Supp.2d 791, 796 (D. Del. 2012) ("Generally, a suit against a [ ] public officer in his or her official capacity is used to compel that officer to take some official action [and that] concept . . . is inapplicable to suits against private parties where the entity is also susceptible to suit."). Even if official capacity suits against individuals who work for private companies are cognizable, the suit would, in effect, be one against the company for whom that individual works. *Kentucky v. Graham*, 473 U.S. 159, 165-66 (1985). Since Rivera has not attempted to name that entity, the official capacity claims against PrimeCare employees are dismissed. *Accord Burk v. West*, No. 21-4968, 2021 WL 5758945, at *2 (E.D. Pa. Nov. 24, 2021).

Official capacity claims against county employees at CCP are indistinguishable from claims against the Chester County. *See Graham,* 473 U.S. at 165. ("Official-capacity suits . . . 'generally represent only another way of pleading an action against an entity of which an officer is an agent.'") (quoting *Monell v. N.Y.C. Dept. of Soc. Servs.*, 436 U.S. 658, 690, n. 55 (1978)). To state an official capacity claim/municipal liability claim against Chester County employees, Rivera would have to allege plausibly that a county policy or custom caused a constitutional violation. *See Monell v. Dep't of Soc. Servs. of N.Y.*, 436 U.S. 658, 694 (1978); *Natale v. Camden Cnty. Corr. Facility*, 318 F.3d 575, 583-84 (3d Cir. 2003). The plaintiff "must identify [the] custom or policy, and specify what exactly that custom or policy was" to satisfy the

13

pleading standard. *McTernan v. City of York,* 564 F.3d 636, 658 (3d Cir. 2009). Rivera fails to allege that he suffered a constitutional violation due to a policy or custom of Chester County. The only policy allegation he makes is directed to Medical Director Jenn and Administrator Karen Murphy as policy makers for PrimeCare. Accordingly, his official capacity claims against the Chester County employees are not plausible and must be dismissed without prejudice. The Court will permit Rivera to amend his pleading to reassert an official capacity claim/*Monell* claim against Chester County should he be able to cure this defect.

### C.    Deliberate Indifference Claims

Rivera asserts constitutional claims for deliberate indifference to his serious medical needs. The vehicle by which federal constitutional claims may be brought in federal court is 42 U.S.C. § 1983. "To state a claim under § 1983, a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law." *West v. Atkins*, 487 U.S. 42, 48 (1988); *see also Groman v. Twp. of Manalapan*, 47 F .3d 628, 638 (3d Cir. 1995) ("The color of state law element is a threshold issue; there is no liability under § 1983 for those not acting under color of law.").

To state a plausible constitutional claim based on the failure to provide medical treatment, a prisoner must allege facts indicating that prison officials were deliberately indifferent to his serious medical needs.[8] *See Farmer v. Brennan*, 511 U.S. 825, 835 (1994). A

---

[8] Although he was serving a sentence in Delaware, it appears that Rivera was held as a pretrial detainee at the time of the events in question and, accordingly, the Fourteenth Amendment governs his claims. *See Hubbard v. Taylor*, 399 F.3d 150, 166 (3d Cir. 2005). However, the standard under the Eighth Amendment and Fourteenth Amendment for claims related to a prisoner's medical needs is essentially the same for purposes of the analysis. *See Parkell v. Morgan*, 682 F. App'x 155, 159 (3d Cir. 2017) (*per curiam*); *see also Moore v. Luffey*, No. 18-1716, 2019 WL 1766047, at *3 n.2 (3d Cir. Apr. 19, 2019) (declining to address whether

prison official is not deliberately indifferent "unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* at 837. "A medical need is serious, . . . if it is one that has been diagnosed by a physician as requiring treatment or one that is so obvious that a lay person would easily recognize the necessity for a doctor's attention." *Monmouth Cnty. Corr. Institutional Inmates v. Lanzaro*, 834 F.2d 326, 347 (3d Cir. 1987) (internal quotations omitted). Deliberate indifference is properly alleged "where the prison official (1) knows of a prisoner's need for medical treatment but intentionally refuses to provide it; (2) delays necessary medical treatment based on a non-medical reason; or (3) prevents a prisoner from receiving needed or recommended medical treatment." *Rouse v. Plantier*, 182 F.3d 192, 197 (3d Cir. 1999). A serious medical need exists where "failure to treat can be expected to lead to substantial and unnecessary suffering." *Colburn v. Upper Darby Twp.*, 946 F.2d 1017, 1023 (3d Cir. 1991).

Not every complaint of inadequate prison medical care rises to the level of deliberate indifference. *Anderson v. Price*, No. 22-3058, 2023 WL 5814664, at *2 (3d Cir. Sept. 8, 2023) (*per curiam*). "Where a prisoner is receiving some amount of medical treatment, [courts] presume that the treatment is adequate absent evidence that it violates professional standards of care." *Id.* (affirming dismissal of deliberate indifference claims on screening) (citing *Brown v. Borough of Chambersburg*, 903 F.2d 274, 278 (3d Cir. 1990); *see also Hayes v. Gilmore*, 802 F. App'x 84, 88 (3d Cir. 2020) (*per curiam*) ("Where a prisoner has received some amount of medical treatment, it is difficult to establish deliberate indifference, because prison officials are

---

a new standard applies to claims raised by pretrial detainees based on issues related to medical care).

afforded considerable latitude in the diagnosis and treatment of prisoners."); *Davis v. Superintendent Somerset SCI*, 597 F. App'x 42, 45 (3d Cir. 2015) (*per curiam*) ("[w]here a prisoner has received some medical attention and the dispute is over the adequacy of the treatment, 'federal courts are generally reluctant to second guess medical judgments and to constitutionalize claims which sound in state tort law.'") (quoting *United States ex rel. Walker v. Fayette Cnty.*, 599 F.2d 573, 575 n.2 (3d Cir. 1979)).

Allegations of medical malpractice and the mere disagreement regarding proper medical treatment are insufficient to establish a constitutional violation. *See Palakovic v. Wetzel*, 854 F.3d 209, 227 (3d Cir. 2017); *Spruill v. Gillis*, 372 F.3d 218, 235 (3d Cir. 2004); *Brown*, 903 F.2d at 278 ("While the distinction between deliberate indifference and malpractice can be subtle, it is well established that as long as a physician exercises professional judgment his behavior will not violate a prisoner's constitutional rights."); *White v. Napoleon*, 897 F.2d 103, 110 (3d Cir. 1990) ("If a plaintiff's disagreement with a doctor's professional judgment does not state a violation of the Eighth Amendment, then certainly no claim is stated when a *doctor* disagrees with the professional judgment of another doctor.  There may, for example, be several acceptable ways to treat an illness."); *McKinley v. Stanish*, No. 21-00960, 2022 WL 4369974, at *7 (M.D. Pa. Sept. 21, 2022) ("[W]here a dispute in essence entails no more than a disagreement between an inmate and doctors over alternate treatment plans, the inmate's complaint will fail as constitutional claims under § 1983 since the exercise by a doctor of his professional judgment is never deliberate indifference." (internal quotations omitted)).

### 1.    Denial of Pain Medication

Rivera's deliberate indifference claims against Dr. Kavalack and PA Patty based on his allegation that they denied or delayed his being prescribed Neurontin for his nerve pain from the

time he arrived at CCP in November 2024 until PA Patty prescribed him Cymbalta 30mg on January 29, 2025 (*see* Suppl. Compl. ¶¶ 112-113) will be served for a responsive pleading. Rivera alleges that Dr. Kavalack would not continue his previous prescription telling Rivera "let's see if you're here in a month." (Compl. ¶ 6.) PA Patty also allegedly recorded in his chart inaccurately that his "concerns were addressed." (*Id.* ¶ 12.) Both Kavalack and Patty allegedly said they had not reviewed his medical records before making these determinations and Rivera was given no reason why his prior medication was discontinued nor a reason he was not prescribed another medication. (*Id.* ¶ 6.) These allegations, along with allegations in the Supplemental Complaint about Rivera's continuing requests for pain treatment (Suppl. Compl. ¶¶ 104-107) until he was prescribed Cymbalta as a substitute for Neurontin, are sufficient to allege a delay or denial of treatment. Rivera's allegation that PA Jaclyn Casey refused to give him pain medication for his neck and back during his MAT appointment on January 10, 2025 will also be served.

The allegation that Rivera told Breanna Culp about his pain while she was tending to his legs is not sufficient to allege a plausible denial of care claim, however. Rivera appears to allege that he was under the incorrect impression that he would be discussing his dosage and also asked if he could be addressed regarding his back pain, but she replied "I'm only going to handle your legs" and said she would order compression socks, at which point Odukele interrupted her. (Compl. ¶ 29.) This allegation about an isolated incident, apparently added to give context to Rivera's claim discussed below against Defendant Odukele, lacks any suggestion that Culp intentionally refused, delayed, or prevented Rivera from receiving care.

Rivera has also not provided sufficient factual allegations to allege a viable claim against PrimeCare. A private corporation under contract to provide medical services at a jail or prison

may be liable under § 1983 in certain circumstances.  The United States Court of Appeals for the Third Circuit has held that "a private health company providing services to inmates 'cannot be held responsible for the acts of its employees under a theory of respondeat superior or vicarious liability.'"  *Sims v. Wexford Health Sources*, 635 F. App'x 16, 20 (3d Cir. 2015) (quoting *Natale v. Camden Cnty. Corr. Facility*, 318 F.3d 575, 583 (3d Cir. 2003).  Rather, in order to hold a private health care company like PrimeCare Medical, Inc. liable for a constitutional violation under § 1983, Rivera must allege the provider had "a relevant . . . policy or custom, and that the policy caused the constitutional violation [he] allege[s]."  *Natale*, 318 F.3d 575, 583-84 (citing *Bd. of the Cnty. Comm'rs of Bryan Cnty., Oklahoma v. Brown*, 520 U.S. 397, 404 (1997)); *see also Lomax v. City of Philadelphia*, No. 13-1078, 2017 WL 1177095, at *3 (E.D. Pa. Mar. 29, 2017) ("Because [defendant] is a private company contracted by a prison to provide health care for inmates, . . . it can only be held liable for constitutional violations if it has a custom or policy exhibiting deliberate indifference to a prisoner's serious medical needs.") (citations and quotations omitted).

A plaintiff may also state a basis for liability against an entity like PrimeCare by "alleging failure-to-supervise, train, or discipline . . . [and alleging facts showing] that said failure amounts to deliberate indifference to the constitutional rights of those affected."  *Forrest v. Parry*, 930 F.3d 93, 106 (3d Cir. 2019).  In the context of a contract medical provider, the provider's "failure to train or supervise must amount to a policy or custom in disregard of an obvious risk that its employees or agents would commit constitutional violations."  *Ponzini v. PrimeCare Med., Inc.*, 269 F. Supp. 3d 444, 526 (M.D. Pa. 2017), *aff'd in part, vacated in part on other grounds sub nom. Ponzini v. Monroe Cnty.*, 789 F. App'x 313 (3d Cir. 2019).

Rivera fails to allege that the denial of his pain medication was due to a PrimeCare policy. While he alleges in a different context that there is a "custom of corrections [officers] interfering with inmates' medical needs which holds the County and PrimeCare Medical liable," (Compl. ¶ 25), the allegation is unrelated to his plausible denial of pain medication claim and he alleges no facts to indicate plausibly that a PrimeCare policy caused a violation of his civil rights. Accordingly, the claim against PrimeCare will be dismissed but Rivera will be provided the option of filing an amended complaint to attempt to cure the defect in his claim or proceeding only on the claim that has passed statutory screening.

### 2.    Denial of MRI Tests

PA Patty allegedly refused to order an MRI test when Rivera injured his wrist and shoulder. This claim is not plausible since Rivera concedes he received an x-ray that indicated his wrist was not broken and PA Patty scheduled him for a follow up appointment. (Suppl. Compl. § 110.) PA Patty allegedly refused to order an MRI on his shoulder because he showed only signs of age-related degeneration but prescribed 1000 mg of Tylenol. (*Id.* ¶¶ 110-111.) When Rivera told her it began to ache again following an incident with a correctional officer and asked for the MRI, PA Patty instead offered him medication for his injury, including Cymbalta, to which he agreed, and said they would discuss an MRI in three weeks. (*Id.* ¶¶ 112-113.) Having offered Rivera some treatment for his injury, the fact that he was not provided the treatment of his choice does not establish a plausible deliberate indifference claim concerning the MRI test.

### 3.    Denial of Eczema Products

Rivera asserts in the Supplemental Complaint that non-defendant Nurse Keisha Bates forgot to bring him eczema products on January 2 and January 18, 2025, but he did receive his

lotion and shampoo on January 19. Because these allegations assert only isolated incidents, they fail to allege a deliberate indifference claim.

### 4.    Denial of Mental Health Therapy

Rivera names Dr. Orlinsky and Dr. Morrison as Defendants in the Supplemental Complaint. On February 7, Rivera was taken to see Defendant Dr. Orlinsky, a mental health provider, whom he asked about not receiving treatment for schizophrenia and bipolar disorder. (*Id.* ¶ 172.) Orlinsky told him that Defendant Dr. Morrison was to follow up and that he would be scheduling for a follow up appointment, but that did not happen. (*Id.* ¶ 173.) While Rivera makes other allegations about being denied mental health services – that he received no services between December 26, 2024 and January 23, 2025 because, apparently there was insufficient staff to escort him from the RHU, he does not ascribe that failure to a named Defendant. His allegation that Chester County "does not offer anything more in regards to treatment" unless an inmate is classified as "minimum" (*id.* ¶ 124), is undeveloped and insufficient to assert a municipal liability claim. It is also contradicted by his allegation that he is receiving mental health treatment "regularly seeing the mental health doctors" as part of his MAT treatment. (*Id.* ¶¶ 126-127.) Because he concedes that he receives services, his deliberate indifference claims against Drs. Orlinsky and Morrison are not plausible.

### D.    Karen Murphy

Rivera asserts that Karen Murphy, the PrimeCare administrator, allows corrections officials to interfere with inmate care when inmates are involved in physical altercations and have injuries or are suicidal, but does not allege that he was himself injured by this conduct. (*Id.* ¶ 18.) Murphy also allegedly "acknowledge and accepted" that CCP's mattresses are "non-compliant" with a Pennsylvania regulation. (*Id.* ¶ 20.) Murphy also allegedly "fails to adhere"

to regulations on prisoner grievances. (*Id.* ¶ 21.) None of these allegations state plausible claims.

First, Rivera's claim that Murphy interfered with the care of other inmates is improper because, as a *pro se* litigant, Rivera may not assert a claim on behalf of another individual. Under 28 U.S.C. § 1654, parties "may plead and conduct their own cases personally or by counsel" in the federal courts. Section 1654 thus ensures that a person may conduct his or her own case *pro se* or retain counsel to do so. *See Osei-Afriyie v. Med. Coll. of Pa.*, 937 F.2d 876, 882 (3d Cir. 1991) ("The statutory right to proceed *pro se* reflects a respect for the choice of an individual citizen to plead his or her own cause." (quoting *Cheung v. Youth Orchestra Found. of Buffalo, Inc.*, 906 F.2d 59, 61 (2d Cir. 1990) )). Although an individual may represent himself *pro se*, a non-attorney may not represent other parties in federal court. *See Collinsgru v. Palmyra Bd. of Educ.*, 161 F.3d 225, 232 (3d Cir. 1998) ("The rule that a non-lawyer may not represent another person in court is a venerable common law rule."), *abrogated on other grounds by Winkelman ex rel. Winkelman v. Parma City Sch. Dist.*, 550 U.S. 516 (2007). Rivera also has no standing to assert a claim on behalf of others. *Elliott v. Davis*, No. 24-2426, 2024 WL 3431993, at *2 (E.D. Pa. July 16, 2024) ("because the only claims Elliott attempts to bring are on others' behalf, he lacks standing").

Second, even accepting as true that Murphy acknowledged and accepted that mattresses violate a Pennsylvania regulation, there is no allegation that she was personally responsible for the condition. *See Rode v. Dellarciprete*, 845 F.2d 1195, 1207 (3d Cir. 1988) ("A defendant in a civil rights action must have personal involvement in the alleged wrongs" to be liable.); *Murray v. McCoy*, No. 23-2582, 2024 WL 1328231, at *3 (3d Cir. Mar. 28, 2024) ("Superintendent Ransom's awareness of Murray's allegations concerning C.O. McCoy, without more, is

insufficient to establish personal involvement" (citing cases)).  Moreover, it is well settled that mere violation of an internal policy or a regulation does not, in itself, amount to a constitutional infringement because state agency guidelines do not, in and of themselves, create a right and do not have the force of law.  *See Bullard v. Scism*, 449 F. App'x 232, 235 (3d Cir. 2011) (*per curiam*) (explaining that, even if prison officials violated a regulation, such a violation "is not actionable"); *Atwell v. Lavan*, 557 F. Supp. 2d 532, 556 n.24 (M.D. Pa. Dec. 21, 2007) (a prison policy manual does not have the force of law and does not rise to the level of a regulation).  As such, a violation of a regulation, guidelines or internal policy does not automatically rise to the level of a constitutional violation.  *See United States v. Fattah*, 858 F.3d 801, 813-14 (3d Cir. 2017) (citing *United States v. Christie*, 624 F.3d 558, 573 (3d Cir. 2010) for approval that a "violation of internal policy alone does not amount to a violation of constitutional due process" because government policies and guidelines "do not themselves create rights"); *see also Hovater v. Robinson*, 1 F.3d 1063, 1068 n.4 (10th Cir. 1993) ("[A] failure to adhere to administrative regulations does not equate to a constitutional violation."); *Walker v. Zenk*, No. 01-1644, 2007 WL 4895973, at *9 (M.D. Pa. Nov. 15, 2007) ("[A]lleged violations of prison policies do[ ] not rise to the level of a Constitutional claim."), *adopted in part and rejected in part*, 2008 WL 351250 (M.D. Pa. Feb. 7, 2008); *Estrella v. Hogsten*, No. 06-1340, 2007 WL 2065879, at *7 (M.D. Pa. July 16, 2007) (noting that there is no such controlling constitutional principle that the mere failure of prison officials to follow their own regulations alone amounts to a constitutional violation); *see also United States v. Jiles*, 658 F.2d 194, 200 (3d Cir. 1981) (noting that even violations of state law will not automatically have a "constitutional dimension").

      Finally, Rivera cannot base a plausible claim against Murphy based on her alleged involvement in a grievance because "prisoners do not have a constitutional right to prison

grievance procedures." *Gerholt v. Wetzel*, 858 F. App'x 32, 34 (3d Cir. 2021) (*per curiam*)

(citing *Massey v. Helman*, 259 F.3d 641, 647 (7th Cir. 2001) and *Flick v. Alba*, 932 F.2d 728,

729 (8th Cir. 1991) (*per curiam*)). Accordingly, allegations such as those raised by Rivera

predicated on failures of the grievance process or improper handling of or response to grievances

do not give rise to a constitutional claim. *See Woods v. First Corr. Med. Inc.*, 446 F. App'x 400,

403 (3d Cir. 2011) (*per curiam*) ("We agree with the District Court that because a prisoner has

no free-standing constitutional right to an effective grievance process, Woods cannot maintain a

constitutional claim against Lucas based upon his perception that she ignored and/or failed to

properly investigate his grievances." (internal citation omitted)); *Burnside v. Moser*, 138 F.

App'x 414, 416 (3d Cir. 2005) (*per curiam*) (explaining that "[i]nmates do not have a

constitutionally protected right to the prison grievance process" and that "a state grievance

procedure does not confer any substantive constitutional right upon prison inmates" (internal

quotations and citations omitted)); *see also Folk v. Prime Care Med.*, 741 F. App'x 47, 51 (3d

Cir. 2018) (*per curiam*) ("Although some of these defendants were apparently involved in

responding to some of Folk's prison grievances, there are no allegations linking them to the

underlying incidents and thus no basis for liability based on those later grievance reviews.").

### E.    Other Medical Providers

Rivera included PA Isabella, PA Gabriella Checci, and Medical Director Jennifer in the

list of Defendants in his original Complaint but alleges no facts there concerning how any of

them were involved in his medical treatment at CCP, or how any of them allegedly violated his

constitutional rights by refusing, delaying, or preventing him from receiving care for a serious

medical need. He included "PAs employed by PrimeCare Medical, Inc.," PA Culp, MAT

Counselor Stephanie Conelly, Medical Director Jennifer, Dr. Eastdat, and Dr. Cirrone as

Defendants in the Supplemental Complaint but asserts no claims against these individuals. Accordingly, the claims against them are not plausible but Rivera will be permitted the option of filing an amended complaint to cure this defect.

### F.    Non-medical Provider Defendants

Rivera claims that, following an attack by another inmate and his placement in segregation, C/O Presswood would not permit Nurse Kelsey to give him his medication. (Compl. ¶ 22.) Also, at the end of his shift on December 17, 2024, C/O Hirsh confiscated digestive medication that Rivera had been dispensed earlier that day when Hirsh was present. (*Id.* ¶ 25, 76.) Finally, he mentions an incident when Defendant C/O Odukale interrupted his discussion with a medical official and would not give him privacy while providing a urine sample. (*Id.* ¶ 25.) These claims are either undeveloped or not plausible and cannot proceed as pled.

Beyond the fact that these appear to be isolated incidents, Rivera fails to detail what medication Presswood would not permit Kelsey to give him and the nature of the medical need for which he was allegedly denied care. While with regard to Hirsh, Rivera mentions digestive medication, but he does not allege that the nature of any serious medical need. The allegation that Odukele interrupted a conversation and refused Rivera privacy while he provided a urine sample also fails to allege a serious medical need and the alleged denial of privacy is also not a plausible claim. *See Hudson v. Palmer*, 468 U.S. 517, 530 (1984) ("[P]risoners have no legitimate expectation of privacy. . . ."). Without any details about the nature of his medical needs, Rivera's claims against Presswood, Hirsh, and Odukele must be dismissed, But Rivera will be permitted the option to amend these claims as well.

Rivera also asserts a claim against the IDT members for "not ensuring proper mental health treatment while he was housed on the RHU." (Suppl. Compl. Claim 11.) He alleges that the IDT members' decision to classify him beyond a "minimum" security risk interfered with his ability to get mental health programming. (*Id.* ¶¶ 125-126.) This claim against non-medical providers is not plausible because Rivera concedes that he is "regularly seeing the mental health doctors" as part of his MAT treatment. (*Id.* ¶¶ 126-127.)

Finally, Rivera asserts that Warden Holland, in his role as a supervisor, "enforces corrections to interfere with medical treatment." (*Id.* Claim 146.) The claim against Warden Holland is not plausible because generalized allegations that a supervisory defendant is "in charge of" or "responsible for" an office or facility are insufficient to allege personal involvement in an underlying constitutional violation. *See Saisi v. Murray*, 822 F. App'x 47, 48 (3d Cir. 2020) (*per curiam*) ("Saisi asserted that some defendants were 'in charge of agencies that allowed this to happen,' and that liability stemmed merely from defendants' 'belief' that their conduct would be 'tolerated.' However, a director cannot be held liable 'simply because of his position as the head of the [agency].'" (quoting *Evancho v. Fisher*, 423 F.3d 347, 354 (3d Cir. 2005)). Also, liability under § 1983 cannot be predicated on a *respondeat superior* basis. *Chavarriaga v. N.J. Dep't of Corr.*, 806 F.3d 210, 227 (3d Cir. 2015); *Robinson v. Delbalso*, No. 22-2378, slip op. at 3-4 (3d. Cir. Nov. 28, 2022) (*per curiam*).

Rather, "[s]uits against high-level government officials must satisfy the general requirements for supervisory liability." *Wharton v. Danberg*, 854 F.3d 234, 243 (3d Cir. 2017). There are "two general ways in which a supervisor-defendant may be liable for unconstitutional acts undertaken by subordinates." *Barkes v. First Corr. Med., Inc.*, 766 F.3d 307, 316 (3d Cir. 2014), *reversed on other grounds by Taylor v. Barkes*, 575 U.S. 822 (2015). First, a supervisor

25

may be liable if he or she "'with deliberate indifference to the consequences, established and maintained a policy, practice or custom which directly caused [the] constitutional harm." *Id.* (quoting *A.M. ex rel. J.M.K. v. Luzerne Cnty. Juvenile Det. Ctr.*, 372 F.3d 572, 586 (3d Cir. 2004) (alteration in original)). "Second, a supervisor may be personally liable under § 1983 if he or she participated in violating the plaintiff's rights, directed others to violate them, or, as the person in charge, had knowledge of and acquiesced in the subordinate's unconstitutional conduct." *Chavarriaga*, 806 F.3d at 227. Rivera's conclusory allegation that Warden Holland "enforces corrections to interfere with medical treatment" is insufficient to allege a plausible policy claim and Rivera makes no allegations that Holland was personally involved in a denial of medical care.

## IV.    MOTION FOR PRELIMINARY INJUNCTION

Rivera's request for a preliminary injunction, filed on February 25, 2025, the same day he filed his Supplemental Complaint, seeks relief that relates both to his medical claims and to those that will be severed from this case. To the extent it relates to the medical claims that remain a part of this case, the motion will be denied.

Federal Rule of Civil Procedure 65 governs temporary restraining orders and preliminary injunctions and the standards are the same. *Bieros v. Nicola*, 857 F. Supp. 445, 446 (E.D. Pa. 1994). Preliminary injunctive relief "is not granted as a matter of right." *Kershner v. Mazurkiewicz*, 670 F.2d 440, 443 (3d Cir. 1982). Rather, a "preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (internal quotations omitted). "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of

preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. NRDC, Inc.*, 555 U.S. 7, 20 (2008); *Fulton v. City of Philadelphia*, 922 F.3d 140, 152 (3d Cir. 2019). "The first two factors are prerequisites for a movant to prevail." *Holland v. Rosen*, 895 F.3d 272, 286 (3d Cir. 2018). "If these gateway factors are met, a court then considers the remaining two factors and determines in its sound discretion if all four factors, taken together, balance in favor of granting the requested preliminary relief." *Reilly v. City of Harrisburg*, 858 F.3d 173, 179 (3d Cir. 2017). "A plaintiff's failure to establish any element in its favor renders a preliminary injunction inappropriate." *Nutrasweet Co. v. Vit-Mar Enters.*, 176 F.3d 151, 153 (3d Cir. 1999).

Rivera asks for a preliminary injunction directing the Defendants to give him "his prescribed treatment for his neck and back pain as he is not being sufficiently treated by medical." (ECF No. 7 at 1.)  He also asks for an MRI of his wrists, shoulders, right ankle and nose bone "as they have given x-rays which only show breaks and not actual damage done by defendants" (*id.*), and for mental health treatment.  Because the Court has determined that Rivera's claims based on the failure to obtain MRI testing and his mental health treatment claims are not plausible as alleged, he cannot show a likelihood of success on the merits of these claims and there is no basis for granting that preliminary relief.  Because he asserts that he has received an alternate form of pain treatment as of January 29, 2025, he cannot show he is likely to suffer irreparable harm as to that request for preliminary relief.  Accordingly, the motion will be denied.

## V.    CONCLUSION

For the reasons stated, the Court will sever Rivera's medical claims from the balance of the claims raised in the Complaint.  Rivera's claims against Dr. Kavalack, PA Patty, and PA

Jaclyn Casey concerning the denial of pain medication from October 30, 2024 to January 29, 2025 can be served for a responsive pleading, but all of his other medical claims will be dismissed without prejudice because they are not plausible as pled. The order that follows will provide Rivera the option to proceed only on the denial of pain medication claim or file an amended complaint to attempt to reassert the other medical claims that the Court has dismissed without prejudice.

BY THE COURT:

JEFFREY L. SCHMEHL, J.